DENVER & I. RY. CO. v. UNITED STATES.*

(Circuit Court of Appeals. Eighth Circuit. October 11, 1916.)

No. 4594.

COMMERCE ⬡28—HOURS OF SERVICE ACT—TELEGRAPH OPERATOR—"INTERSTATE COMMERCE."

On a part of its line the defendant railroad company was engaged in the carriage of interstate passengers, and other of its trains ran over the tracks of a second railroad company engaged in interstate commerce. Defendant's telegraph operator, at a point where no interstate trains of defendant passed, occasionally took messages for the passing of its trains with the interstate trains of the second company, whose tracks defendant used. Such operator received his orders from the chief train dispatcher of the second company, which was largely engaged in interstate commerce. *Held* that, though such operator was not regularly engaged in receiving messages relating to interstate trains and traffic, he was engaged in interstate commerce within Hours of Service Act March 4, 1907, c. 2939, 34 Stat. 1415 (Comp. St. 1913, §§ 8677–8680), and defendant, by requiring or permitting him to continue at labor for longer than authorized, is liable, for a railroad engaged in interstate commerce cannot evade the act by having its employés work excessive hours with respect to its intrastate traffic.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 22; Dec. Dig. ⬡28.

For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

In Error to the District Court of the United States for the District of Colorado; Robert E. Lewis, Judge.

Action by the United States against the Denver & Interurban Railway Company. There was a judgment for plaintiff, and defendant brings error. Affirmed.

The plaintiff in error was sued to recover a penalty for the violation of the act of Congress known as the "Hours of Service Act," of March 4, 1907 (34 Stat. 1415, c. 2939; Comp. St. 1913, §§ 8677-8680). The allegations in the complaint are that the defendant, a common carrier engaged in interstate commerce by railroad in the state of Colorado, permitted a telegraph operator and employé at its office at Globeville, Colo., J. L. Ream, to be and remain on duty for a longer period than 9 hours in the 24 hours period, beginning with 3

o'clock p. m. on July 4, 1914, and ending at the hour of 1:07 o'clock a. m. on July 5, 1914; that at the time said office was one continuously operated day and night, and said employé was one regularly required and permitted by the use of the telegraph and telephone, to dispatch, report, transmit, receive, and deliver orders pertaining to and affecting generally the movement of trains over a through highway of interstate commerce, and occasionally the movement of trains engaged in the transportation of interstate traffic over said highway.

A demurrer to this complaint was filed by the defendant, and by the court overruled. The defendant declining to plead further, a penalty of $200 was assessed by the court, which it is now sought by this writ of error to reverse. At the time the demurrer was filed a stipulation agreeing on the facts was filed, and a written agreement that it was to be considered by the court as if a part of the complaint, to be accepted by the trial court and the appellate court as the facts in the case, in the consideration of the demurrer. The agreed statement of facts is as follows:

"(1) Defendant is, and was on and about the time mentioned in plaintiff's amended complaint, a common carrier engaged in such commerce by railroad as is hereafter more fully described.

"(2) Attached hereto, marked Exhibit A, and made a part of this stipulation is a map showing in colored lines other than white the railroad over which defendant operated its cars and trains in 1914. The green line represents the track owned and operated exclusively by the Denver City Tramway Company. The part shown in red is owned and operated by defendant.. The yellow line represents road owned by the Colorado & Southern Railway Company (hereafter called the C. & S.), but operated exclusively by defendant. The part shown in black represents the track owned by said C. & S. and operated jointly by said company and defendant. All of said line between Globeville and Boulder and Boulder Junction is single-tracked. The white line represents the track operated exclusively by said C. & S., and parallels the line operated by defendant the greater part of the distance between Louisville Junction and D. & I. Junction on the north and a point several miles north of the north boundary line of the city and county of Denver. The line between Marshall and Eldorado Springs and the red line between Boulder and Boulder Junction are owned and operated exclusively by defendant. Electric cars or trains of defendant moving from Denver to Boulder are operated over the lines and under the control of the Denver City Tramway Company to Globeville, at which point they are turned over to defendant's train crews, who operate them to Boulder. Special cars or trains for passengers exclusively are sometimes operated between Denver and Eldorado Springs, but the usual service to Eldorado Springs is a branch service from Marshall. The operation of defendant's cars and trains north of Globeville is entirely under the control and direction of the chief train dispatcher and superintendent of said C. & S., who are employed also to act as chief train dispatcher and superintendent, respectively, for defendant; and over that portion of the line (black) where the two companies operate jointly the defendant has trackage rights for its own cars and trains. The telegraph operators and agents at Globeville and Eldorado Springs are employés solely of defendant, while the operators and agents on that portion of the line north of Globeville are employed by said C. & S. to render a joint service for both companies. With the exception of the line between Marshall and Eldorado Springs, defendant at no time operated cars or trains for other than passengers moving solely in intrastate commerce. Between these stations, however, it carried interstate passengers, baggage, and express; the same being hauled into and out of Marshall by said C. & S. No part of said interstate traffic ever passes through Globeville, and on July 4, 1914, defendant moved no interstate traffic whatsoever on any part of its road. On said date defendant's entire business consisted solely of the transportation of passengers moving wholly intrastate.

"(3) Said C. & S. is, and was on and about the times mentioned in plaintiff's amended complaint, a common carrier engaged in interstate commerce by railroad in the state of Colorado, and its said line of railroad, commencing at the Union Depot in Denver, passing through Utah Junction and thence north to Louisville Junction, where it branches and proceeds by two different lines

(via Louisville Junction and Marshall, and via Webb and Louisville) to the city of Boulder, including that portion of the lines over which said joint trackage rights are maintained, forms part of a through highway of interstate commerce over which interstate trains of said C. & S. are regularly and generally operated, except that between 3 p. m. July 4, 1914, and 2 a. m. July 5, 1914, no trains moving interstate traffic of any character were operated by said C. & S. over any of the tracks shown on Exhibit A. Some cars and trains of defendant, while being operated over portions of said line in joint use, occasionally have meeting and passing points with interstate passenger and freight trains of said C. & S. (but no such meeting or passing points were had on July 4, 1914); at such times they must protect themselves against all trains having superior rights. The regular passenger trains of said C. & S. have rights superior to defendant's cars and trains, while the latter have superior rights over freight trains of the former. When a train order is transmitted to the crew of one of defendant's trains, which pertains to or affects the meeting or passing point of said car or train and a C. & S. train, a similar or corresponding order is delivered to the crew of the latter train affected by such order; but no C. & S. train ever passes through Globeville, and no such order is ever delivered to a C. & S. train by or through the Globeville operator.

"(4) On July 4, 1914, and during the entire time said Globeville operator is charged with being on duty over nine hours, said C. & S. operated no freight trains over any portion of its line between Denver and Boulder or Boulder Junction; and after 3 p. m. on said date, until 2 a. m. July 5, 1914, it operated no passenger trains between said points carrying either passengers, baggage, or express moving in interstate commerce; but during said last-named period the entire traffic moved over all lines of said C. & S. shown on Exhibit A was wholly intrastate in its character.

"(5) With particular reference to the allegations in said amended complaint with respect to the duties required by defendant of its said Globeville operator, the following facts may be considered: All train orders transmitted through said Globeville operator are delivered only to the trainmen of defendant's cars or trains. Said Globeville operator never received any orders relating to C. & S. regular passenger trains, or pertaining to or affecting the meeting or passing places of such trains and cars or trains of defendant when said C. & S. regular passenger trains were on time. If any of said regular passenger trains were late, any train orders relating thereto or pertaining to the meeting or passing places with defendant's cars or trains were generally issued and transmitted through operators at points north of Globeville, although occasionally such orders relating to passing or meeting points of said delayed trains and defendant's cars or trains were transmitted through the Globeville operator. When extra C. & S. passenger trains were run, orders relating to the meeting or passing places thereof and defendant's cars or trains were generally transmitted through operators at stations other than Globeville, although occasionally such orders were issued and transmitted through said Globeville operator. Defendant's regular passenger cars or trains had superior rights over all C. & S. freight trains, and no orders pertaining to the meeting or passing places of such trains and defendant's cars or trains were ever transmitted through said Globeville operator, except in case of an accident or other cause requiring the detouring of said freight train over defendant's rails. Such orders were sometimes transmitted through said Globeville operator, although generally through operators north of Globeville. On July 4, 1914, all train orders transmitted through said Globeville office and pertaining to or affecting train movements of both C. & S. trains and cars and trains of defendant related solely to movements of trains engaged only in intrastate commerce."

T. M. Stuart, Jr., of Denver, Colo. (E. E. Whitted, of Denver, Colo., on the brief), for plaintiff in error.

Philip J. Doherty, Sp. Asst. U. S. Atty., of Washington, D. C. (H. B. Tedrow, U. S. Atty., of Denver, Colo., on the brief), for the United States.

Before CARLAND, Circuit Judge, and TRIEBER and VAN VALKENBURGH, District Judges.

TRIEBER, District Judge (after stating the facts as above). The contention of the plaintiff in error is that neither the defendant, nor its employé, I. L. Ream, were engaged in interstate commerce, and therefore not subject to the requirements of the act of Congress, for the violation of which the penalty sought to be recovered by this action was assessed. Another ground upon which the plaintiff in error relies is that even if the defendant was engaged in interstate commerce at times, and the telegrapher was also so engaged at times, neither of them was engaged in interstate commerce on the day that the statute is alleged to have been violated.

The plaintiff in error was engaged in interstate commerce by railroad between Marshall and Eldorado Springs, and between those stations it carried interstate passengers, baggage, and express, although it was hauled to Marshall by the Colorado & Southern Railroad, and none of that traffic ever passed through Globeville over the plaintiff in error's road. The operator, Ream, was in the employ of the plaintiff in error, and under the control of the chief train dispatcher of the Colorado & Southern Railway Company. As such operator he controlled the electric cars in trains of the plaintiff in error as they moved northward from Globeville toward Boulder. Some of these trains were special passenger trains of the plaintiff in error, which were sometimes operated between Denver and Eldorado Springs. Trains passing north from Globeville before reaching Boulder, or Eldorado Springs, went over the interstate highway of the Colorado & Southern Railway Company; the two roads maintaining joint trackage rights over that part of the road, which is a part of the through highway of interstate commerce over which the interstate trains of the Colorado & Southern Railway Company are operated.

At times the cars and trains of the plaintiff in error, while being operated over portions of said line of railway have passing points with interstate passenger and freight trains of the Colorado & Southern Railway Company, and at such times it must protect its trains against all trains having special rights. In order to prevent accidents it is necessary that they should have telegraphic train orders, and occasionally train orders relating to passing or meeting points of delayed passenger trains on the Colorado & Southern Railway Company. These orders were transmitted through this operator, Ream. Occasionally orders were in the same way issued and transmitted through this operator relating to meeting and passing places of extra Colorado & Southern interstate trains and defendant's trains. That part of the plaintiff in error's road from Marshall to Eldorado Springs is clearly an interstate highway, and so are the tracks from Vesuvius Mine to Boulder Junction and from Louisville Junction to Boulder, which were used by the Colorado road for its interstate trains and by the plaintiff in error for all its trains going to Boulder. The operator at Globeville received his orders from the chief train dispatcher of the Colorado & Southern Railway Company, and he had to direct his trains in accordance therewith. This clearly made the plaintiff in error a

road engaged in interstate commerce, and Mr. Ream an employé engaged in the operation of trains. Baltimore & Ohio R. R. Co. v. United States Interstate Commerce Commission, 221 U. S. 612, 31 Sup. Ct. 621, 55 L. Ed. 878; N. Y. Central R. R. v. Carr, 238 U. S. 260, 35 Sup. Ct. 780, 59 L. Ed. 1298; Seaboard Air Line v. Koennecke, 239 U. S. 353, 355, 36 Sup. Ct. 126, 60 L. Ed. 324; St. Joseph & Grand Island R. R. v. United States, 232 Fed. 349, 146 C. C. A. 397. In Baltimore & Ohio R. R. Co. v. Interstate Commerce Commission, it was held:

"If, then, it be assumed, as it must be, that in the furtherance of its purpose Congress can limit the hours of labor of employés engaged in interstate transportation, it follows that this power cannot be defeated either by prolonging the period of service through other requirements of the carriers or by the commingling of duties relating to interstate and intrastate operations."

In the Carr Case it was held that a brakeman on an interstate car in a train consisting of both intra and inter state cars, who is engaged in cutting out the intrastate cars, so that the train may proceed, is, while so doing, engaged in interstate commerce.

The proper transmission of train orders through this operator at Globeville, was at times essential to the safe operation of trains intra as well as inter state, on the lines used jointly by these two roads, and when the plaintiff in error required this operator to receive orders from the train dispatcher of the Colorado & Southern Railway Company and transmit them to its employés in charge of its trains, which were operated on an interstate highway, it and the operator were clearly engaged in interstate transportation, and the operation of interstate trains. The fact that on that particular day this operator at Globeville had received no orders relating to interstate trains is wholly immaterial. This act differs in this respect from the Employers' Liability Act. The latter is expressly limited to employés injured "while engaged in interstate business," while the Hours of Service Act applies to all employés actually engaged in or connected with the movement of any interstate trains, regardless of the fact whether at the time the offense was committed he was so employed.

There was a joint traffic arrangement over this line and that of the Colorado & Southern Railway Company, over certain parts of an interstate highway, and all trains using that highway were under the control of one person, the train dispatcher of the Colorado & Southern, admittedly an interstate railway, from whom this operator received his orders, which he was bound to transmit. The courts have been very liberal in construing who are employés of a railroad engaged in interstate transportation. Southern Railway Co. v. United States, 222 U. S. 20, 32 Sup. Ct. 2, 56 L. Ed. 72; Pedersen v. Delaware, L. & W. R. R. Co., 229 U. S. 146, 33 Sup. Ct. 648, 57 L. Ed. 1125, Ann. Cas. 1914C, 153; Illinois Central Ry. Co. v. Behrens, 233 U. S. 473, 34 Sup. Ct. 646, 58 L. Ed. 1051, Ann. Cas. 1914C, 163; Houston & Texas Ry. v. United States, 234 U. S. 342, 34 Sup. Ct. 833, 58 L. Ed. 1341. And in our opinion the defendant and its operator were clearly engaged in interstate commerce.

Upon the agreed facts the judgment of the court below was right, and is accordingly affirmed.